E-FILED
Friday, 05 September, 2008  01:59:05 PM
Clerk, U.S. District Court, ILCD

## IN THE UNITED STATES DISTRICT COURT
## FOR THE CENTRAL DISTRICT OF ILLINOIS
## SPRINGFIELD DIVISION

| | | |
|---|---|---|
| TERRY L. KITCHEN, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No. 07-3172 |
| | ) | |
| MICHAEL J. ASTRUE, | ) | |
| COMMISSIONER OF SOCIAL | ) | |
| SECURITY ADMINISTRATION, | ) | |
| | ) | |
| Defendant. | ) | |

## <u>OPINION</u>

JEANNE E. SCOTT, U.S. District Judge:

Plaintiff Terry L. Kitchen appeals from a final Decision of the Social Security Administration (SSA) denying his application for Disability Insurance Benefits (DIB) and Supplemental Social Security Income (SSI) under Chapters II and XVI of the Social Security Act, 42 U.S.C. §§ 416, 423, and 1381a. Kitchen brings this appeal pursuant to 42 U.S.C. §§ 405(g) and 1383(c)(3). The parties have filed cross-motions for summary judgment or affirmance pursuant to Local Rule 8.1(D). <u>Motion for Summary Judgment (d/e 11)</u>; <u>Motion for Summary Affirmance (d/e 13)</u>. For the reasons set forth below, the Court orders a limited remand of this

case for further proceedings.

## FACTS

Kitchen applied for DIB and SSI on September 8, 2005. He alleged that a neck, shoulder, and arm injury he suffered on October 9, 2003, limited his mobility and made it impossible for him to work. At the time, Kitchen was working as a shelf stocker at Cub Foods. A Navy veteran, Kitchen previously had worked as a truck driver, forklift operator, kitchen worker, and custodian. Kitchen also alleged that he suffered from chronic pain, depression, emphysema, and arthritis in his left shoulder.

The SSA denied Kitchen's claims initially and on reconsideration. Kitchen requested a hearing, which was held via video conference November 30, 2006. On March 20, 2007, an Administrative Law Judge (ALJ) issued a Decision denying Kitchen's application. The Appeals Council denied Kitchen's request for review, and Kitchen now seeks judicial review.

A.    MEDICAL HISTORY

1.    PHYSICAL IMPAIRMENTS

Kitchen was born March 8, 1955. On October 9, 2003, when he was 48, Kitchen was stocking a grocery store shelf and a case of water jugs fell on his right shoulder and neck. He received worker's compensation for this

injury and has not worked since.

Dr. Jeff Brower initially diagnosed Kitchen with a neck and shoulder strain and neuropraxia – nerve conduction failure -- in the upper left arm. He recommended that in the short term, Kitchen lift no more than 5 pounds, limit the use of his left hand, and perform no overhead activities.

After further examination and testing, however, Dr. Brower found degenerative changes and a disc bulge in Kitchen's cervical spine. He also found cervical radiculopathy, a disease of the spinal nerve roots, and ulnar neuropathy, which is an inflamation or compression of the ulnar nerve that results in numbness, tingling, and pain of the outer side of the arm and hand.

In the spring of 2004, Dr. Brian Russell, a neurosurgeon, began treating Kitchen on a referral from Dr. Brower. Dr. Russell believed that the conservative treatment Kitchen had received, including physical therapy, epidural injections, and use of a TENS unit, had provided him only short term pain relief. According to Dr. Russell, Kitchen suffered notable muscle atrophy in his left hand, weakness in the left triceps, foraminal stenosis, degenerative disc disease, and ulnar neuropathy. Dr. Russell recommended surgery -- "a two level anterior cervical discectomy and interbody fusion."

Administrative Record (d/e 8) (R.) 349.  On August 26, 2004, he performed the surgery, which included cadaver bone grafting and hardware replacement.  Kitchen was placed in a cervical collar following surgery.

After his operation, Kitchen saw Dr. Russell for follow-up treatment. Dr. Russell noted that in September, October, and November of 2004, Kitchen appeared to be progressing well.  He remained in the cervical collar until after his appointment on November 2, 2004, however.  At this appointment, Dr. Russell recommended taking Kitchen out of the collar "and progressing into a work conditioning program before his eventual return to work."  R. 277.

In January of 2005, Kitchen began to complain of shoulder discomfort and numbness and tingling in his hand.  Dr. Russell diagnosed ulnar neuropathy that he suspected was associated with muscle atrophy in Kitchen's hand.  R. 278.  Dr. Russell believed that compression surgery might be necessary.

Dr. Russell referred Kitchen to Dr. Koteswara Narla for further testing. Dr. Narla performed EMG nerve conduction studies and concluded  that surgery appeared to have benefitted Kitchen's neck, but that Kitchen suffered from cubital tunnel compression of the ulnar nerve on the left side,

which produced motor and sensory effects.   Dr. Narla agreed that compression surgery would aid Kitchen.

Kitchen also suffered from right shoulder pain and saw Dr. Michael Watson, an orthopedist, for treatment.  Dr. Watson ordered an MRI in January of 2005, which indicated degenerative changes at the acromioclavicular (AC) joint.  Dr. Watson recommended adding rotator cuff strengthening to Kitchen's therapy but concluded that Kitchen did not need further surgery.

In May of 2005, Dr. Russell thought that Kitchen's cervical spine appeared to be doing well.  Yet, Kitchen still exhibited tenderness in his shoulder and atrophy and weakness in his left hand.  Kitchen inquired about surgery for the ulnar neuropathy, and Dr. Russell informed him that if he believed the condition was getting worse, surgery was an option.

In January of 2006, Dr. Vittal Chapa performed a consultative examination for the SSA.  Dr. Chapa found that Kitchen had a decreased range of motion in the cervical spine and left shoulder but that he had full grip strength in both hands and could perform fine and gross manipulations with both hands.  Dr. Chapa also noted clubbing in Kitchen's fingers and decreased pinprick sensation in two of his left fingers.

In February of 2006, Dr. Russell received a recall notice on the bone graft he had performed on Kitchen.  Dr. Russell ordered a variety of tests including tests for hepatitis and HIV.  These tests came back negative.  Dr. Russell advised Kitchen that it was extremely unlikely that the graft caused any ill effects.

On March 17, 2006, another SSA consulting physician, Dr. George Andrews, reviewed Kitchen's medical records and concluded that Kitchen had limited ability to reach in all directions and could climb ladders or scaffolds only occasionally.  He also found that Kitchen had tendinitis and degenerative changes in his AC joint.  Yet, Dr. Andrews also found that Kitchen's fine and gross manipulation ability remained intact and that only decreased pinprick sensation in two of his left fingers hampered his motor and sensory abilities; he noted that Kitchen was right-handed and could write legibly.  Additionally, Dr. Andrews found that no records supported a diagnosis of emphysema.  Dr. Andrews concluded that Kitchen's allegations were only partially credible and that he was capable of performing some work.

Kitchen continued to complain of neck and shoulder discomfort, but Dr. Russell found no ongoing weakness in his arms or radiating pain.  In

April of 2006, he found that Kitchen was doing well, and probably had only a muscle strain.  He prescribed muscle relaxants, exercises, and heat treatment.

In July of 2006, Dr. Joseph Basler performed an MRI and found that Kitchen's spine had straightened some, possibly due to postoperative changes or muscle spasms.  He also found a mild disc bulge, foraminal narrowing, and a number of osteophytes, or bone spurs.

In a follow-up visit with Dr. Russell in September of 2006, Kitchen expressed anxiety regarding the cadaver bone graft recall; he was concerned about communicable diseases.  Additionally, Dr. Russell noted that Kitchen had no radiating arm pain or specific weakness, but he did report pain along the left side of his neck and his trapezius muscle.  Dr. Russell thought this pain had not responded well to physical therapy.

2.  <u>MENTAL IMPAIRMENTS</u>

Kitchen also has a history of mental health treatment.  In December of 2001, Kitchen's employer terminated him on charges of insubordination. The next month, Kitchen began seeing psychiatrist Fareed Tabatabai.  Dr. Tabatabai diagnosed Kitchen with major depressive disorder with anxiety and personality disorder.  Dr. Tabatabai also noted a history of alcohol and

polysubstance abuse.  Dr. Tabatabai continued to treat Kitchen in 2002, but Kitchen failed to attend any appointments between February and December of 2003.

On December 1, 2003, Kitchen returned to Dr. Tabatabai for treatment related to the stress his work-related injury caused.  Dr. Tabatabai diagnosed Kitchen with major depressive disorder and anxiety, but he no longer found personality disorder.  In August of 2004, while Kitchen was awaiting surgery, Dr. Tabatabai noted that Kitchen had fished twice, but otherwise just stayed in his bedroom.  He stated that Kitchen reported discomfort in crowds and at times, a low mood.  In February of 2005, Dr. Tabatabai noted that Kitchen was increasingly depressed and uncomfortable even around his family.

On May 25, 2006, Dr. Tabatabai submitted a medical source statement regarding Kitchen to the SSA.  Dr. Tabatabai opined: "Patient has had chronic depressive symptoms and chronic pain.  He is now being told that a surgical tissue transplant in his neck may need to be removed. I do not see this patient working in the next 1-2 years as a result."  R. 455. Dr. Tabatabai also found that Kitchen's impairments likely would cause him to miss work more than 3 or 4 times per month and that Kitchen was the

type of person for whom a routine, repetitive, simple, entry-level job would serve as a stressor that would exacerbate instead of mitigate psychological symptoms.

Dr. Tabatabai also rated Kitchen's ability to perform various work-related tasks.  First, he found Kitchen's ability to understand and remember very short and simple repetitive instructions or tasks, to maintain socially appropriate behavior, and to adhere to basic standards of neatness and cleanliness only somewhat impaired.

Second, he advised that Kitchen seldom could perform other tasks, and then he would be substantially impaired in terms of speed and accuracy. Those tasks were: remembering locations and work-like procedures, carrying out short and simple instructions or tasks, carrying out detailed instructions that may or may not be repetitive, sustaining an ordinary routine without special supervision, working in coordination with or in proximity to others without being unduly distracted by them, making simple work-related decisions, interacting appropriately with the general public or customers, asking simple questions or requesting assistance from supervisors, accepting instructions and responding appropriately to criticism from supervisors, getting along with co-workers or peers without unduly distracting them or

exhibiting behavioral extremes, noticing normal hazards and taking appropriate precautions, traveling in unfamiliar places and/or to using public transportation, and setting realistic goals or making plans independent of others.

Third, he found that Kitchen was totally precluded from performing the following on a sustained basis: understanding and remembering detailed instructions or tasks, maintaining attention and concentration for 2-hour segments, maintaining a schedule and regular attendance, completing a normal workday and workweek without interruptions from psychologically-based symptoms and performing at a consistent pace without an unreasonable number and length of rest periods, and responding appropriately to expected or unexpected changes at work.

In February of 2006, Dr. Donald MacLean reviewed Kitchen's medical records for the SSA and found that Kitchen's abilities to understand, remember, and carry out detailed instructions, to interact appropriately with the general public, to accept instructions and respond appropriately to criticism, and to respond appropriately to changes were only moderately limited.  In all other mental tasks, he was not significantly limited.  Dr. MacLean concluded that Kitchen could "understand, remember, and carry

10

out simple instructions.  He is able to make simple work related decisions. He is able to get along with others, but unable to sustain public interaction. He is able to cope with changes in simple work situations."  R. 439.

B.    <u>ADMINISTRATIVE HEARING</u>

Kitchen's administrative hearing occurred November 30, 2006.  He and vocational expert Bonnie Gladden were the only witnesses.

Kitchen informed the ALJ that he was 6'0" tall and weighed 180 pounds. He had a tenth grade education and could read and write English. At the time of the hearing, Kitchen lived in a house with his girlfriend and his girlfriend's grandchild.  Kitchen's girlfriend provided all of the household income, except that Kitchen received $150.00 in food stamps each month. Kitchen had no friends and rarely left the house.

In October of 2003, while Kitchen was attempting to place a case of bottled water onto the top shelf at work, he lost his grip and the case came down on his right shoulder and neck.  Kitchen testified that he was prescribed muscle relaxers and pain killers for his injuries.  He noted, however, that the medications had been causing him side effects, including "blurred vision, a lack of concentration and short-term memory loss" and a reduced reaction time between reading and the ability to act upon what he

has read.  R. 471-72.

Since the accident, Kitchen has not worked.  He applied for several jobs as a grocery stocker but never obtained one.  Kitchen testified that he could occasionally lift approximately ten pounds up to shoulder height.  He also testified that he was capable of pushing and pulling, going up and down stairs, walking, standing, and opening doors.  Kitchen never believed he actually could perform the stocking jobs for which he applied, however.  According to Kitchen, his left hand was not dependable.  He could not rely on it to hold anything, and looking up at shelves caused neck pain.  Kitchen also testified that his vision problems affected his ability to read what was inside boxes.  He explained that he applied for the stocking jobs only because he needed money.

Kitchen conceded that he was able to engage in some personal activities.  He watched television for 3.5 hours per day and read for an hour a day.  He also drove a car about 10 miles a week, but if he drove for long using both hands on the wheel, his hand involuntarily contracted and he had to stop to stretch it.  Kitchen sometimes helped with the cooking and dishes and made his bed.  He also could handle daily hygiene and certain outdoor tasks such as taking care of his dogs in the backyard and raking

leaves.  Kitchen noted, however, that if he raked for long, he developed spasms in his hand.  He also testified that he could only sit for 25 to 30 minutes before he needed to get up and stretch and could only stand for 30 minutes at a time.  He could walk about four blocks.

Kitchen also testified that he suffered from depression.  He explained that he felt despair, hopelessness, and anxiety.  He had contemplated suicide many times and now feared "just about everything in the outside world except in [his] little room."  R. 472.  Kitchen's accident compounded these feelings and increased his feeling of worthlessness.  Kitchen stated that he had "bad days" and occasionally would "say something I shouldn't say" to his girlfriend's granddaughter.  R. 482.  Additionally, he sometimes acted on irritations.  For example, he testified that once, while his girlfriend's granddaughter was using the computer, he became irritated with her and threw the computer across the room.  When he experienced these "flare-ups," he "hibernate[d]" in his bedroom to avoid talking to anyone.  R. 482-83.  Kitchen told the ALJ that he had never experienced problems with alcohol or drugs, however.  Additionally, he stated that while no one ever came to visit him, about 10 times a year he visited others.  Several days before the hearing, Kitchen went with his girlfriend to visit a member of her

family for the evening.

After reviewing Kitchen's past work experience, Gladden, the vocational expert, also testified.  The ALJ posed a series of hypothetical questions regarding individuals with various levels of impairment, and Gladden explained which types of jobs would be available to such individuals.

First, the ALJ asked Gladden about an individual of Kitchen's age, education, and work experience limited to "medium work, occasional ropes, ladders, scaffolds.  Limited reaching with the left arm.  Occasional contact with the public and limited to simple tasks." R. 486.  Gladden testified that such an individual would be able to perform the work of a janitor, but not any of Kitchen's other prior jobs. R. 486-87.  In the range of work that this individual could perform, 128,000 janitorial positions existed.  R. 487.  Such an individual also could work as a laborer and freight, stock, and material worker; 25,000 of these jobs existed.  Additionally, this individual could work as a hand packager, and 7,000 of these jobs existed.

The ALJ then revised the question to limit the hypothetical individual to light work.  Gladden then testified that such an individual could still work as a stock and material mover.  At the light level, 3,000 such jobs

existed.  Additionally, this individual could work as a parking lot cashier, and 3,000 of these positions existed.  Finally, such an individual could work as a packing and filling machine operator, and 10,000 of these jobs existed.

If, however, this individual were restricted to sedentary work, Gladden advised that fewer jobs would be available.  Such an individual could work one of 2,000 sedentary laborer and material mover jobs, one of 800 hand packer jobs, one of 3,000 sedentary packing and filling machine operator jobs, or one of 7,000 small parts assembly jobs.

The ALJ then changed the hypothetical question again.  This time, he asked Gladden about an individual of Kitchen's age, education, and work experience who had medically determinable impairments that limited him to simple tasks of only a step or two, who could have no contact with the public and who could lift no more than 20 pounds, and then only occasionally.  Gladden testified that such an individual would not be able to perform any of Kitchen's prior jobs.  He would, however, be able to perform janitorial work at a light level.  But, if that person also could not reach with his left hand or lift bulky objects that required a bilateral grip, he could not perform even a light janitorial job.  Gladden also testified that these restrictions would reduce the number of other jobs available to the

hypothetical individual, but she did not quantify the exact reduction in available jobs. She did state, however, that if this individual also had no ability to perform manipulative tasks with his non-dominant hand, he might be left with only packing and filling machine jobs. Further, Gladden testified that an individual with concentration impairments who had difficulty maintaining a schedule would have trouble retaining any job he did obtain.

C.    THE ALJ'S DECISION

The ALJ concluded that Kitchen was not disabled for social security purposes and issued his Decision on March 20, 2007. Preliminarily, the ALJ determined that Kitchen met the insured status requirements of the Social Security Act through December 31, 2008. He then discussed the five-step analysis set out in 20 C.F.R. §§ 404.1520 & 416.920. The analysis requires a sequential evaluation of: (1) whether claimant is engaged in substantial gainful activity; (2) the severity and duration of claimant's impairment; (3) whether the impairment equals a listed impairment in Appendix 1; (4) whether the impairment prevents claimant from doing his past relevant work; and (5) whether claimant can perform other work, given his residual functional capacity, age, education, and past work experience.

3:07-cv-03172-JES-CHE  # 15  Page 17 of 31

20 C.F.R. §§ 404.1520(a)(4) & 416920(a)(4). The claimant has the burden of presenting evidence and proving these issues on the first four steps. The SSA has the burden on the last step; the SSA must show that, considering the listed factors, the person can perform some type of gainful employment that exists in the national economy. <u>Knight v. Chater</u>, 55 F.3d 309, 313 (7th Cir. 1995); <u>Roth v. Shalala</u>, 45 F.3d 279, 282 (8th Cir. 1995).

The ALJ then applied this analysis to Kitchen's application. First, the ALJ held that Kitchen had not engaged in substantial gainful activity after October 9, 2003. Second, the ALJ found that while Kitchen did not suffer from emphysema, he did have the following severe impairments: arthritis of the spine, left shoulder strain/tendinitis and degenerative changes of the AC joint, left ulnar neuropathy, depression, and anxiety.

Third, however, the ALJ held that none of Kitchen's impairments or combinations of impairments met or medically equaled any of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1. R. 19. The ALJ addressed each possible listing separately.

The ALJ determined Kitchen did not meet or equal the requirements of Listing 1.02B, for major dysfunction of a joint. He based his opinion in part on the MRI from January 19, 2005, which showed no rotator cuff tear

but revealed degenerative changes of the AC joint and a small amount of fluid in the undersurface of the rotator cuff consistent with tendinitis. The ALJ also considered the nerve conduction test performed on January 14, 2005, which revealed a cubital tunnel compression of the left ulnar nerve. Finally, the ALJ relied on Kitchen's testimony that he engaged in activities such as raking leaves, cooking, washing dishes, and making beds. He also indicated that he was independent with his personal hygiene. The ALJ found that Kitchen's ability to perform these activities demonstrated that he could use his hands for "some fine and gross manipulations." R. 19. Thus, the ALJ concluded, Kitchen did not suffer from a major dysfunction of a joint.

The ALJ then addressed Listing 1.04, for disorders of the spine. The ALJ based his Decision on the records regarding Kitchen's August 26, 2004, surgery and follow-up visits with Dr. Russell; the ALJ found that these records indicated that Kitchen's cervical spine appeared to be doing well. An MRI of the cervical spine identified some postoperative changes involving osteophytes, foraminal narrowing, and a mild disc bulge, but there was no evidence of spinal stenosis. The ALJ took into account Kitchen's testimony that he could walk about four blocks and noted that Kitchen did not say

that he needed an assistance device.  Thus, the ALJ found that he failed to establish the requirements of Listing 1.04 or any musculoskeletal listing.

Because Kitchen was diagnosed with depression and anxiety, the ALJ also considered Listing 12.04, for affective disorder, and Listing 12.06, for anxiety-related disorders.  The ALJ reviewed Dr. Tabatabai's February 3, 2004, treatment notes, in which he diagnosed Kitchen with major depressive disorder with anxiety and a history of alcohol and polysubstance abuse.  The ALJ found that Kitchen demonstrates "no more than a mild degree of limitation with respect to activities of daily living and maintaining concentration, persistence or pace and no more than a moderate degree of limitation related to social functioning."  R. 20.  The ALJ also reviewed Kitchen's testimony about his living situation and daily activities and noted that he had shown no repeated episodes of decompensation, residual disease process, or an inability to function outside of a highly supported living environment.  The ALJ concluded Kitchen failed to establish that he met the criteria of these listings.

Fourth, however, the ALJ found that Kitchen could not perform any of his prior work because his past jobs involved medium to heavy exertion levels.  The ALJ discussed Kitchen's testimony and the medical records from

19

his treating and consulting physicians and determined that while Kitchen's

impairments reasonably could be expected to produce the symptoms of

which he complained, Kitchen's allegations regarding their intensity,

persistence, and limiting effects were "not entirely credible."   R. 24.

Specifically, the ALJ stated:

> The undersigned acknowledges that the claimant may experience
> some pain and limitation of functioning related to his diagnosed
> mental and physical impairments; however, he is able to lead a
> relatively active life style despite his health problems.  Based on
> treatment notes from Dr. Russell, the claimant's cervical surgery
> was successful.  Additionally, it was the opinion of Dr. Russell
> that there was no problem with the graft itself, as testing failed
> to produce any evidence which would indicate a need for recall
> of material used in the graft.  Mr. Kitchen was advised to
> undergo ulnar nerve decompression surgery to alleviate
> symptoms involving his left hand; however, this has not been
> performed secondary to financial reasons, according to the
> claimant.  Mr. Kitchen testified that he lives with another adult
> person and a child.  He is independent with his personal care.
> The claimant stated that he drives a motor vehicle, rakes his
> yard on a daily basis for a short period of time, watches
> television for 3 ½ hours per day and reads for 1 hour per day.
> He sometimes cooks, washes dishes and makes beds.  These
> activities indicate that the claimant has the ability to sit, stand,
> walk, lift, etc.  The subjective degree of limitation and pain is
> not consistent with the claimant's reported activities or the
> medical record.

R. 24.  The ALJ also noted that the SSA consulting physicians concluded

that Kitchen's limitations were primarily physical, and that he was still able

to perform activities requiring medium exertion.  The ALJ considered the SSA physicians' conclusions but opted to "give the benefit of every reasonable doubt to the claimant" and found that he was limited to light activity.  R. 25.

Regarding Kitchen's mental impairments, the ALJ noted that he did not find Dr. Tabatabai's opinions controlling.  He stated that Dr. Tabatabai's conclusion that Kitchen would not be able to work for a year or two based on his depression, chronic pain, and the fact that he might need tissue removed from his neck was not consistent with the record as a whole. The ALJ found that Kitchen could drive, work in his yard, interact with others, perform domestic tasks, and concentrate on television and reading materials.  The ALJ also stated that Dr. Tabatabai's treatment reports indicated that medication had reduced Kitchen's symptoms.

Overall, the ALJ found that Kitchen had the residual functional capacity to perform work that required the ability to lift and carry up to 10 pounds frequently and 20 pounds occasionally and stand and walk for the greater part of the day.  Yet, he specified that Kitchen could perform only work requiring no more than the occasional climbing of ladders, ropes or scaffolds, and that he had only a limited ability to reach with his left arm.

21

The ALJ further found that Kitchen could not perform work requiring more than occasional contact with the public or supervisors and that he was limited to simple tasks.

Fifth, the ALJ found that while Kitchen could not perform his prior jobs, given his residual functional capacity, age, education, and work experience, he could perform jobs that existed in significant numbers in the national economy.  Given his findings regarding Kitchen's limitations, the ALJ concluded that Kitchen could perform the work of a parking lot cashier, of which there were 3,000 jobs, and of a packing and filling machine operator, of which there were 10,000 jobs.  Thus, the ALJ found that Kitchen was not disabled.

D.   THE APPEALS COUNCIL

Kitchen asked the Appeals Council to review the ALJ's Decision. He argued that it was contrary to law and unsupported by substantial evidence. Specifically, Kitchen argued that the ALJ improperly disregarded Dr. Tabatabai's opinion that Kitchen's stressors and inability to perform even simple unskilled work would keep him from working over the next one or two years.  Moreover, Kitchen argued that the ALJ misstated his abilities to engage in household activities, interact with others, and drive.  He stated

that he was almost completely isolated at home, rarely drove, and only attempted to perform tasks such as raking leaves.  Further, Kitchen argued that his habit of watching 3.5 hours of television a day did not indicate an ability to concentrate and maintain attention in a work environment. Finally, Kitchen asserted that the ALJ did not specify the nonexertional limitations that restricted Kitchen, and argued that the vocational expert testified that manipulative limitations would make it impossible for a person to perform the jobs the ALJ found Kitchen could perform.  On May 4, 2007, the Appeals Council denied Kitchen's request for review.

## ANALYSIS

Kitchen now asks this Court to find him disabled or remand to the ALJ for further consideration.  Kitchen argues that the ALJ failed to accord proper weight to his treating psychiatrist's opinion or to articulate reasons for rejecting Dr. Tabatabai's opinion.  Kitchen also argues that the ALJ failed to assess his physical functioning adequately and incorrectly characterized his testimony to support a finding that no gripping or manipulation restrictions are necessary.  The Court finds that the ALJ supported both his decision to reject Dr. Tabatabai's opinion and his assessment of Kitchen's left hand abilities with substantial evidence.  In a

footnote, however, Kitchen also argued that the ALJ failed to consider whether Kitchen was disabled for a discrete time period immediately following his neck surgery, as opposed to suffering an ongoing disability. The Court agrees that the ALJ did not address this issue.

The Court reviews the ALJ's decision to determine whether it is supported by substantial evidence.  Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate" to support the decision.  Richardson v. Perales, 402 U.S. 389, 401 (1971).  This Court must accept the ALJ's findings if they are supported by substantial evidence and may not substitute its judgment for that of the ALJ.  Delgado v. Bowen, 782 F.2d 79, 82 (7th Cir. 1986).  The issue before this Court is whether the ALJ's findings were supported by substantial evidence, not whether Kitchen is disabled.  Jens v. Barnhart, 347 F.3d 209, 212 (7th Cir. 2003).  The ALJ must at least minimally articulate his analysis of all relevant evidence.  Herron v. Shalala, 19 F.3d 329, 333 (7th Cir. 1994).  The Court must be able to "track" the ALJ's analysis to determine whether the ALJ considered all important evidence.  Diaz v. Chater, 55 F.3d 300, 308 (7th Cir. 1995).

A.     THE TREATING PSYCHIATRIST'S OPINION

Kitchen argues that the ALJ's rejection of Dr. Tabatabai's opinion was

not supported by substantial evidence.  Dr. Tabatabai advised that Kitchen's depression and anxiety would make it impossible for him to concentrate for more than 2 hours at a time, maintain regular attendance, complete a normal workday, perform at a consistent pace, or respond appropriately to changes.  The ALJ, however, concluded that Kitchen's mental impairments did not qualify as listed impairments because Kitchen could concentrate on television for 3.5 hours a day, read for one hour, "drive a motor vehicle, work in his yard, interact with others and perform household activities."  R. 25.  Thus, the ALJ concluded, Kitchen was only mildly limited regarding daily living activities and concentration and only moderately limited in his social functioning.  Moreover, in determining Kitchen's residual functional capacity, the ALJ found only two mental limitations necessary: he concluded that Kitchen could not perform work requiring more than occasional contact with the public or supervisors and that Kitchen was limited to simple tasks.

"A treating physician's opinion is entitled to controlling weight if it is well supported by medical findings and not inconsistent with other substantial evidence in the record."  Dixon v. Massanari, 270 F.3d 1171, 1177 (7th Cir. 2001).  Yet, the SSA Commissioner, not a doctor selected by

the claimant, decides whether the claimant is disabled.  20 C.F.R. § 404.1527(e)(1).  A treating physician's statement about the effect of a claimant's symptoms on his ability to work does not alone establish that a claimant is disabled.  Dray v. R.R. Retirement Bd., 10 F.3d 1306, 1311 (7th Cir. 1993).  An ALJ is required to consider such statements, but not to accept them.  20 C.F.R. § 404.1529.  An ALJ may discount the medical opinion of a treating physician where the opinion is internally inconsistent or inconsistent with other evidence.  Knight, 55 F.3d 314.

Here, Dr. Tabatabai's opinion is internally consistent, but the ALJ found it inconsistent with other evidence, namely Kitchen's own testimony regarding his daily activities.  The ALJ clearly identified specific aspects of Kitchen's testimony that he believed contradicted Dr. Tabatabai's opinion. The Court can track his reasoning.  Whether or not the Court would have viewed the evidence as the ALJ did is irrelevant.  So long as he identified evidence that a reasonable mind might accept as adequate to support his conclusion, the Court must uphold it.  See Richardson, 402 U.S. at 401. Because other courts have concluded that similar testimony regarding a claimant's mental abilities constituted substantial evidence that a claimant is not disabled, the Court cannot find the ALJ's conclusion unreasonable.

See, eg., Powers v. Apfel, 207 F.3d 431, 435 (7ᵗʰ Cir. 2000) ("While we are skeptical that the ability to watch television for several hours indicates a long attention span, we agree that reading and playing cards do suggest such a trait."); Denham v. Barnhart, 2004 WL 1699021, at *5 (N.D. Ill. July 26, 2004) (finding that a claimant's ability to drive herself to school and to doctor appointments necessitates a degree of concentration and supports the ALJ's conclusion that her concentration was only mildly impaired); Sienkiewicz v. Barnhart, 2003 WL 22757756, at *8 (N.D. Ill. Nov. 19, 2003) (upholding an ALJ's conclusion that a claimant can concentrate well enough to preclude a finding of disability based on her testimony that "she drives, does errands[,] visit[s] family, reads, watches television, fixes things and plays cards and games").

Moreover, the ALJ also pointed out that the SSA's consulting physician, Dr. Donald MacLean, found that Kitchen was at most moderately limited in certain tasks, such as carrying out detailed instructions and interacting with the general public.   Dr. MacLean concluded that Kitchen's mental impairments did not disable him for social security benefit purposes.   By specifically relying on this evidence and particular aspects of Kitchen's testimony, the ALJ adequately articulated his

rationale for disregarding Dr. Tabatabai's opinion.  The ALJ's assessment of Kitchen's mental impairments is supported by substantial evidence.

B.    KITCHEN'S ABILITY TO GRIP AND MANIPULATE

Kitchen also objects to the ALJ's conclusion that he can perform light activity, including activities requiring him to grasp or manipulate objects. Kitchen argues that the ALJ rejected any possibility of gripping or manipulation restrictions merely because Kitchen has not undergone surgery for his left hand impairment.  The ALJ's opinion belies this assertion, however.

In his opinion, the ALJ discussed and analyzed contrasting evidence on Kitchen's hand.  The ALJ noted Kitchen's testimony that he cannot rely on his left hand and often drops things.  He discussed the fact that Kitchen's treating physicians, Dr. Russell and Dr. Narla, both found that Kitchen suffers from an ulnar neuropathy that affects the motor and sensory capacities of his left hand.  EMG nerve compression studies confirmed their diagnoses.  Neither doctor specified the level of impairment the neuropathy produced, but the ALJ stated that both recommended surgery.  The ALJ also noted that both SSA consulting physicians concluded that while Kitchen suffered some decreased sensation in his left hand, his gripping and

manipulation abilities remained intact.  Based on the contradiction between Kitchen's and his physicians' opinions and the opinions of the SSA physicians, the ALJ stated that he would afford Kitchen "every reasonable doubt" and find him "limited to light exertional activity with nonexertional restrictions as identified."  R. 25.  Kitchen argues that the ALJ failed to identify any nonexertional restrictions, but the ALJ clearly held that Kitchen should have no more than occasional contact with the public or supervisors and should be limited to simple tasks.  These are nonexertional restrictions. Thus, the ALJ clearly explained the basis of his Decision.  Because he identified evidence that a reasonable mind might accept as adequate to support his conclusion, the Court must uphold it.  See Richardson, 402 U.S. at 401.

C.    PRE-SURGERY DISABILITY

While the ALJ supported his rejection of an ongoing disability with substantial evidence, he failed to address the possibility that Kitchen was disabled for a discrete period of time following his surgery.  Kitchen has alleged a disability onset date of October 10, 2003, the day after his accident stocking water bottles.  He never worked after that date and underwent surgery involving a discectomy and interbody fusion on August

26, 2004.  On November 2, 2004, more than a year after his accident, Kitchen was still in a cervical collar, and his treating physician recommended Kitchen undergo a work conditioning program before returning to work.  While the ALJ noted that Kitchen's surgery apparently was successful, he failed to address whether Kitchen was disabled before he underwent the surgery or recovered from it.  The SSA may award benefits retroactively for a "closed period" when a claimant suffers a disability but that disability has abated by the time of the claimant's administrative hearing.  See, eg., Lee v. City of Salem, Ind., 259 F.3d 667, 669 (7th Cir. 2001).  Because the ALJ failed to consider this possibility, the Court remands for the limited purpose of determining whether Kitchen was disabled before he underwent surgery and recovered from it.

THEREFORE, Plaintiff's Motion for Summary Judgment (d/e 11) is DENIED in part and ALLOWED in part, and Defendant's Motion for Summary Affirmance (d/e 13) is ALLOWED in part with respect to the finding that Kitchen is not now disabled.  The Decision is remanded, however, for further consideration of the limited issue of a closed period of disability.  The Decision of the Commissioner is reversed and remanded for further proceedings consistent with the Opinion, pursuant to sentence four

of 42 U.S.C. § 405(g).

IT IS THEREFORE SO ORDERED.

ENTER:   September 5, 2008

FOR THE COURT:

_____ s/  Jeanne E. Scott _____
JEANNE E. SCOTT
UNITED STATES DISTRICT JUDGE